My name is Charles Filbreck. I represent the Plaintiff Appellant WireCo WorldGroup here. In this case, Liberty Mutual, WireCo's workers' compensation insurance carrier, overcharged WireCo a total of $545,000 over the course of three renewal policies. Here's how Liberty Mutual did it. Workers' compensation is a highly regulated and required insurance product that employers like WireCo have to buy. The pricing structure for the policies are designed so that equally suited employers are being charged the same amount because they all have to get it. One employer shouldn't enjoy a competitive advantage over another simply because they have to buy workers' compensation insurance. All the factors in the premium calculation are essentially outside of Liberty Mutual's control except one, the schedule rating factor. But even in that context, the schedule rating factor is specifically tailored to a certain type of the aspect of the risk. In this particular instance, WireCo's experience rating modification factor, it's called the XMOD, experience mod, improved year to year as the policies renewed significantly. So much so that by the third year, the change in experience mod, which is calculated by a third party, the NCCI, National Council of Compensation Insurers, reduced WireCo's premium over $240,000. But with respect to each renewal, Liberty Mutual changed the schedule rating factor and in doing so offset the premium benefit from the change of the experience modification factor. And that is strictly prohibited by the experience rating plan manual and by the schedule rating plan that was submitted by Liberty and approved by the regulators. The schedule rating factor is limited only to characteristics of the risk that do not include the insured's experience. Both plans say that categorically. The Department of Insurance for Missouri has issued two bulletins about schedule rating. They're in the submissions. They make it clear schedule rating is not supposed to change year to year on renewal unless the risk characteristics of the operations change. The only way Liberty Mutual was allowed under its schedule rating plan to change the was if there was a change in WireCo's risk characteristics. That would be safety equipment, training of employees, and other characteristics laid out in their plan. That has to change. And then the underwriter has to have documentation of the change in his or her underwriting file before a change in the schedule rating plan, schedule rating factor, is allowed to be employed. There is a civil procedure issue. She found that WireCo's complaint only pled the concept of breach by failure of documentation as to the Texas risk, but not as to the Missouri risk. And she's wrong about that for several reasons. First, paragraph one of the... I believe that's true. I believe that's true also. Basically what she said was, WireCo, you only pled lack of notice as to the And lack of documentation. The documentation is a key requirement. No, she acknowledged that we pled that as to Texas, but not as to Missouri. But paragraph one of the complaint says, WireCo seeks to recover premium overpayments improperly charged by Liberty Mutual on three workers' compensation insurance policies issued by Liberty Mutual to WireCo. The overpayments were due to Liberty Mutual improperly increasing premiums by changing the schedule rating factor without providing WireCo notice as required by the contracts and by failing to obtain required documentation. Opening statement of the complaint. There's no... You got the specific counts, which is focused on Missouri notice and Texas documentation, isn't there? That's entirely correct, but a plaintiff alleging breach of contract need not articulate every theory of There's no requirement to do so, and there's certainly no claim here of... What the judge looked to for her authority was that case authority where a plaintiff was trying to avoid summary judgment by presenting a new theory. One of her cases, it was a tort-based case, and the plaintiff, to avoid summary judgment, articulated a here at all. We articulated in the complaint, breach of contract, failure to comply with the terms of the schedule rating plan. That's more than sufficient to put them on notice that any violation of those schedule rating plans is at issue. We moved for summary judgment right at the get-go, and Liberty said, we need additional time, we need discovery. So the court postponed the summary judgment motions. During discovery, Wireco propounded interrogatories that said, identify the documents that you're relying on to justify your schedule rating changes in the schedule rating factor, and identify when those documents got into your file. Liberty Mutual, by the way, refused to answer those questions, or didn't answer those questions. They said they would, but they didn't. It wasn't an objection. So the point is, they knew perfectly well that the case was in play, and was part of our affirmative motion for summary judgment. So her conclusion that it had not been adequately pled is inconsistent with the case authorities, and inconsistent with the federal rule of notice pleading. Even if we were held to that limitation, we still win. They're obligated to provide a notice in Missouri of, the notice is detailed, it delineates what the old factor was, what the new factor is, and why there's changes. And that's crucial, because it gives the insured an opportunity to cure, so as to preserve the old number, the old schedule rating factor. That was never done here, and there's no evidence that it was ever done. What could have been cured here? Pardon me? What could have been cured in this case, if it had been the notice that you say was required? Well, if there was a change in the operations, then let's just say that certain safety equipment on the machinery was removed. Well, don't get me hypothetical. Didn't you do discovery on what was the basis for the change in the schedule? We did. There's no... What is it that they said was the basis that you could have cured? The carrier is obligated, the underwriter is obligated to create a schedule rating worksheet that goes into the underwriting file, and they're obligated to maintain it. The Liberty Mutual underwriters never created those, except for the very last policy. They were essentially just changing the schedule rating factor to adjust for the experience modification change. There's no documentation in the evidence of any risk... Well, but the notice would underscore the fact that it was a legitimate change, do you see? In order to send the notice, the notice would delineate a legitimate change. If it tried to delineate an illegitimate change, my client could say, that risk characteristic didn't change. You can't change it because those machines always had those safety devices on them. You cannot now say that the safety devices are inadequate. So your argument isn't that you could have cured, it's that you could have objected to the change? My argument is that notice is material. That that notice requirement and the schedule rating... Well, I'm not trying to cut out why it's material. First, you said it's because you could have cured something. I'm not trying to cure something because we could have said the basis for the change is illegitimate. The whole point of the schedule rating plan and its requirement to force the carrier to document and be objective evidence is to protect against the kind of abuse that happened here. If you look at the department 2003, because of these kinds of abuses, using the schedule rating factor for things other than the risk characteristics. Schedule rating was allowed again, and in 2002, the department reaffirmed that it's crucial that the carrier honor its obligation to document its schedule rating factor and provide notice to the carrier of why it's changing the factor. Liberty Mutual didn't do that because the reasons for its changing the factor had nothing to do with Wireco's risk characteristics. I'd like to preserve five minutes. Could you touch on this question about incorporation by reference in the savings plan? Because she said that the savings plan was not incorporated in the policy. She did, and we submit that the policy language is perfectly clear. All premium for this policy will be manuals of rules, rates, rating plans, and classifications. That language is in the policy twice. It's categorical. There's no other way to calculate the premiums except by those government-approved manuals and rating plans. They obviously are a part of the contract, and the carrier and the insured are both obviously compelled to comply with them as binding contractual provisions. And her result that an insured has no right against no breach of contract claim against its insurance carrier when it gets overcharged premium in a way that's inconsistent with those binding contractual terms, it's an absurd and unreasonable result. Clearly those things are incorporated into and part of these contracts, and I'll reserve the rest of my time. Thank you. Thank you, Your Honor. Good morning, and may it please the Court. To put some context in this case, this is not a case about somebody not getting what they paid for. This is a case about an insured attempting to create a private right of action out of a regulatory requirement by bootstrapping it to a policy that was paid for and provided to the insured. Within that context, I want to talk about three things absent the Court having a different plan for me. My plan is to talk about incorporation first and how the fact that these rating plans as a regulatory animal are not incorporated into the policies, and we'll discuss that language. I then want to talk about the damage side of it and how that provides the Court with an alternative basis to grant summary judgment regardless of the incorporation issue. And then third, given enough time, we'll talk about the dismissal of the vexatious refusal claim. And first, on the incorporation side, I don't think there's any disagreement on what the Missouri standard is for incorporation of one document into another. The intent to incorporate must be clear, and this comes from the Hewitt v. Kerr case, which is a Moe and Bonk 2015. That's cited by the plaintiffs. The mere mention of a document does not incorporate the terms of that document. That's the Dunn Industrial Group case, which is also a Moe and Bonk from 2003. The reference must be such that the terms is... Sure. And given time, I'll run... Absolutely, absolutely. And there are multiple doctrines swirling around this. We have the obvious one of incorporation under Missouri law. And I've got examples of what constitutes incorporation. And given time, I'll read those to you. And then we have examples from, say, Hewitt that give language which is stronger. In that case, Hewitt was an arbitration provision. Certainly. And I think the cases cited by the district court are directly on point. And the Truex case the court cited actually distinguishes Seaberg. And the type of provision that's in this policy is a common provision that is... And I'll give you another example. For example, contracts and statutes often refer to interest rates that will apply based upon, for example, the prime rate as set out in the Wall Street Journal plus 1% as of the date of the breach. So you then have a contractual right, if there's a breach, to pluck that interest rate out of the Wall Street Journal, apply it as interest, but it doesn't make the Wall Street Journal part of the contract. And that's exactly why the Truex court distinguished the Seaberg case, which is one that was cited by plaintiffs. Seaberg stands for the proposition that if you say in your contract, I'm going to go to the Wall Street Journal and I'm going to pluck that interest rate out, then you have a contractual right to go to the Journal and pluck that interest rate out. Again, it doesn't make the Journal the... It does. That's exactly what it does. It allows you to... No, there truly is a difference. It's the only way that you can reconcile the different cases, for example, like Seaberg, with the Truex case. I mean, we have hard and fast requirements for incorporation. But that's not the claim here. The claim is not here that we didn't pluck out the right number. We did pluck out the right number. That was the schedule rating that we were going to apply to that policy. We put it in the quote. We put it in the policy, and they never objected to it. So this isn't... Again, he discussed the experience mod. Experience mod is a third party... In this case, it's determined by the NCII, and it's based upon the loss history for the various insureds. The claim information goes to NCII. They calculate an experience mod, and then you're allowed to go to that experience mod, which is part of your filings. You pluck it out, and then you apply it to the premium. But it doesn't make the whole NCII manual part of your contract. So you have a contractual right to pluck that rate, and you have a contractual right to For example, we didn't have a filing that said our scheduling for Wireco is 10%, and we actually applied 15% of the policy. We applied exactly what we were supposed to apply. Now, these workers' comp type disputes have often been, through the years, over whether or not you grabbed the right experience mod, that you didn't use the right one that applied to this particular policy. Again, it doesn't make NCII part of your policy. It just means you used the wrong number. No allegation here that we used the wrong number. Their allegation is that we didn't comply with the regulatory requirements created by the Missouri Department of Insurance. Kind of segueing into their... case of the manual having anything to do with schedule ratings. Those are out of the schedule rating plans. Remember, these are a creature of regulation. Schedule rating plans have only been required since 1997. The manual rating plan is a different animal. It is a... and it was described by appellant's counsel at the oral argument as a phone book of documents that all insurance companies have that lay out your rating plan. But we're not talking about that manual. We're talking about the schedule rating plan only, which again is this creature of regulation. Again, when you look at the language that's in there, and it refers... remember this policy applies to 12 states. Some states have schedule rating plans that you must file. Some states don't have schedule rating plans that you must file. The Missouri plan requires the notice be given 90 days after the schedule rating is put into effect. It has a documentation requirement. It's different than the Texas requirement. The Texas schedule rating plan does have a documentation requirement. So are you willing to concede that those apply to you by virtue of the policy language saying that the schedule rating policy is... that's how the premium is going to be determined? No. Those are not contractual terms. Those are regulatory requirements that are in place. For example, we have... and it lays out a litany of things that insurers must do in handling a claim. And those are not... do not create a private right of action. So yes, you may violate them, and yes, that may result in the DOI taking action against you. For example, a market conduct study. But those don't create a private right of action where you can say you're supposed to respond in 30 days. You owe me money automatically. When the policy says that the premium will be determined by our manuals of rules, classification, rates, and rating plans, you say that does not refer to the schedule rating plans? And it may refer to this... well, that's a question. Because for incorporation, it has to specifically set out exactly what you're talking about. Automatically, you're telling me, though, the manual of rating plans is not the schedule rating plans? It's not. The manual of rules... see, depending upon where you're looking at in the policy, but under item 4, which is the declarations, the premium for this policy will be determined by our manuals of rules, classifications, rates, and rating plans. So to the extent the schedule rating plan falls under anything, it falls under a rating plan. It doesn't fall under the manual of rules. But there's no reference in any of this to a schedule rating plan. There's references to rating plans. There's no references to a state. I'm sorry? Yeah, it's the experience modification. You have to file those as well. The experience modification of the manual of rating plans? Yes, workers' comp is complex in the sense that there's regulatory environment around it. But the interpretation of this policy is not complex. So there are multiple rating plans. And that actually illustrates the whole issue here. We're having a conversation back and forth where this court, well prepared as it is, doesn't know what these are referring to. But you can't. That's the whole point. Under Missouri law, to incorporate, you have to know exactly what they're talking about. I found a statute. A Missouri statute says every policy of insurance against liability under this chapter shall be in accordance with the provisions of this chapter. So it seemed to me that the regulations under this workers' comp law would have to be in accordance with the part of the policy. But there's no chapter that requires the exact language of what Liberty Mutual put into its schedule rating plan. The existence of a plan is necessary. But the statute doesn't dictate the exact language. In fact, the only notice language The statute has a different notice requirement. The statutory notice requirement is that if the insured contacts you about a schedule rating, you have to provide them with information as to who they should contact. That's what the statute requires, which is a different obligation than what Liberty Mutual puts into its schedule rating plan. But again, the statute itself is not part of the contract. The statute is the statute. And there's no, you know, it does not create an independent cause of action. So, I mean, when you look at the cases that are cited, and especially the cases that in the briefing, as far as what constitutes incorporation versus what does not constitute incorporation, these terms in these particular policies don't come anywhere near incorporation. I mean, all Exactly. And it set out all of these terms. I'm sorry, Judge. The schedule rating is part of the pricing. No, it is specified in the contract. Yes, there is. Yeah, there is. In fact, I can point you to it. Yeah, at the end, so the premium, the preliminary premium that is paid by the insured, every component of it, the experience mod, the schedule rating that we're talking about here today, discounts, the terrorism surcharge, the classifications of employees, the rate per employees, the number of employees, all of that is set forth expressly in the policy. You do not have to go anywhere else to determine how a premium is calculated. In fact, immediately below item four, that refers to our rates are calculated, it refers you back to the additional information page. And at that additional information page, all of this information is laid out. And that's one of the examples is at JA 182 in the record. It's the extension of information page. So all of these terms are in the policy. There's no reason to go outside the policy to find these terms. All the language is doing that has been focused on by Wireco in this case, it is simply telling you where you pull those numbers from. It's just like the Wall Street Journal. It exists, it's a number, and it may change over time. So therefore, the policy as recognized by the Seabird case, that language allows you to go get that number. But it doesn't say anything about the whole thing is then incorporated into the agreement. So that's where I think we've gotten removed from what the Missouri incorporation standards are. And we're looking at a, I won't say a hybrid or an exception, but we're not incorporating collateral documents. We're simply using them to pull information in. But the policy itself provides that information. There's no reason to. Those don't go into, I mean the number's the number. And you either pull the right number or you're not pulling the right number. And then if you don't comply with your plan as you've identified to the DOI, that's a DOI issue. Well, you could have argued that we pulled in the wrong number, but we didn't. I mean, that was the number that we intended. That was the number But that does not create a private right of action. The schedule rating is intended to, by the DOI, to influence insurers to act in a certain manner. Like many, many regulatory schemes, they're intended to motivate behavior, but they don't create private rights of action. A scheduling plan does not create a private right of action unless you somehow incorporate it into the policy. And there's no cases that would say that this vague language that we've struggled with here this morning somehow pulls in that specific plan. Well, the answer is no. And there's no evidence of that anywhere in the record. That's their claim and that's their supposition. Is that the theory of this plan? It's not a theory. I guess it's a motive, is what they're claiming. It's a motive that they're claiming. It's a motive for using an improper number. It's not, I guess, a cause of action. But then we flip back to Liberty Mutual lost money on every single one of these policies. So if you want to look at it in the global picture, did they get what they paid for or didn't get what they paid for? Were these numbers right or were these numbers wrong? The policies all exceeded the premiums, every single one of them. So these weren't a bargain for Liberty Mutual. And so if you're going to look at it globally, the answer is these prices were fair. In fact, they were extremely fair. Well, the bargain for issue, I think, is key. Because ultimately, if you get to the damage side of this, I don't think we ever get to the damage side. I don't think we ever get to the issue of whether those other claims should have been ignored. Sure. And I think what you were talking about is were they bargained for with the prices. Because we'd raised that issue before. Absolutely. There was a quote in advance. And all of this is part of the record. There was a quote in advance. And the policy itself sets forth in detail the schedule ratings that are used from year to year to year. So all you have to do is compare them to the prior year, and obviously you can see that they've changed over time. There's also expressly set out in the policy exactly how the schedule rating affects the premium. The insurer has the right to cancel the policy at any time. Without notice, all you've got to do is send a letter that says cancel. And any premiums that you're owed can be refunded. So as soon as that policy shows up, if they've got a dispute with the schedule rating, they can say, I don't want to pay that, and please cancel the policy. I'm going somewhere else. And that kind of flips back to the remedy side of it. Of course there's remedies. Don't buy the policy. If you don't like the schedule rating, cancel it and go somewhere else. Administrative remedies, if we're not following our So it's not a situation where they're left without a remedy. Right. That's actually referenced in the first... As the Court's aware, Wireco contacted the Missouri Department of Insurance and raised this issue. And they didn't just raise the issue. They demanded that the Department of Insurance order Liberty Mutual to refund certain amounts of premiums. And the response back to the Missouri Department of Insurance was, if the documentation is not in the files as required by the schedule rating, that could be the subject of a market conduct exam. So the DOI recognized in that letter there are certainly administrative... I don't know if it's a remedy, but there are potentially an audit. So I was trying to understand if the audit was separate from the administrative audit. Absolutely. And I didn't mean to confuse those. The audit's done by Liberty Mutual pursuant to the terms of the policy. So there's an audit by Liberty Mutual that they can trigger on the policy. Now what about damages? You wanted to say something about damages. Yeah, absolutely. And again, I don't think we get to damages. But to the extent we get to damages, the measure of damages they've had has changed over time. When they went to the DOI, they said one thing, then they said a different thing. And then by the time this lawsuit came, they've created this proxy of damages that is, we're going to go back to 2009. We're going to grab a schedule rating that was in a different insurer's policy. And we're going to say you have to stick with that throughout these three years. They can never explain, nor is there any case law that would support that that's the proxy for damages. Damages are damages. And as the Court was asking questions of my opposing counsel, what's the downside of not receiving that notice? Is it material? Is it not material? That's the question as far as damages. Okay, so if somehow this notice provision and this document provision is part of the policy, and if we breach those provisions, then what are their damages? They received a policy that their own broker in 2011 says one of his best renewals ever. Liberty Mutual lost money on these policies, and they have no evidence of alternative or cheaper policies. So had that notice been provided, there's no evidence that this would have worked out any differently. And they did have actual notice of what the schedule ratings were. They knew exactly what they were, and they knew exactly how they impacted the premiums. And at any point in time, they could have said no, we don't want to buy it. So you're saying there's no evidence of an alternative policy that would cost less? None. None. And in fact, based upon what evidence is there, that these policies were at a large loss to Liberty Mutual. You know, you can read further into that that there were no such options that could have been available. Sure. When they made their original demand to the Department of Insurance, they took two of the policy years. They took the schedule ratings for those years, 15% and 25%. They multiplied them by the premiums, and they said we should get a $400,000 refund. So no going back to the 4.8. They just simply said we should get a refund. The schedule rating should have been zero. When they went back to the Department of Insurance, they went back to the 1.8 rate, which was in the 2010 policy. And they said, well, we think it should be 1.8 for two years, and not the 15 and not the 25. So they calculated it at 1.8, and then they asked the Department of Insurance for that number and asked them to force Liberty Mutual to provide it. When the suit was filed, they then went back to this 4.8 from the 2009 policy and said, no, it should have been a 4.8 credit and not the debits that it was. So they added the policy, and they I think that's... Right, but they can't even be consistent on what they consider to be the overcharge. Absolutely. But what's missing is any term in the policy that would trigger that, and what they've essentially said in their briefing as well as the oral argument in front of the district court is, if you don't follow your schedule rating plan to the T, you forfeit the right to have a schedule rating change. I mean, that's their theory of damages. That doesn't come from anywhere. It doesn't come from regulation. It doesn't come from statute. It certainly doesn't come from the policy. So that being the case, we resort back to, well, if these are terms, and if they were breached, then what are your damages? Would anything different have happened? And the answer is, of course not. They would have still bought this policy. I just want to... No, because as the So if they would have said, we're not paying that schedule rating, we want it to go back to be a 4.8 credit, we would have said, we're not selling it to you. So it's not an overpayment. This is what the amount was. We applied the schedule rating that we calculated. There's no dispute about that. It is the right rate. And if the scheduling plan was not strictly adhered to, that's a regulatory issue. Thank you. I would appreciate that. That was enlightening. Thank you. Just a couple quickies. Seaburg, that's a case where an insurance policy made reference to an experience rating plan as something that is referenced. And the Court said clearly that is a part of the contract and therefore applies. Its terms applies. Excuse me. The schedule rating plan delineates or constrains what schedule rating factor the insurance carrier may use. They use, Liberty used 4.2% in the first year. And the schedule rating plan and the Department of Insurance are very clear, that 4.2% credit means it reduces the premium, is not supposed to change unless the insured's risk criteria changes. And if the risk criteria changes, then the underwriter has to have documentation of the change in its file. Correct. That's precisely it. Yes. But those are all provisions in the contract, the schedule rating plan, that delineate to safeguard the abuse of the factor. We're sort of getting ahead of ourselves in the sense that the correct factor was 4.2% credit on the first policy. And Liberty is not allowed to change that unless it demonstrates a change in the risk criteria. How do you force them to offer a policy at a price that they don't want to offer? They did offer a policy using a 4.2% credit. Originally. And the policy, the manuals of rules, the rates, the rating plans and the classifications delineate how premium is determined. The schedule rating plan determines the schedule rating factor. They can't change the schedule rating factor off of the 4.2% unless there's a change in the risk characteristics. They've got documentation of the change in their file. And with Missouri, they provide notice of the change in risk characteristics. None of those things happened. And the evidence is uncontradicted that the risk characteristics never changed. Now, I want to get to... Your theory is that they're then required to keep offering the policy at the 4.2% if they can't get proper notice and documentation. No, they could not renew. They could choose not to renew. How are you damaged here? Because... But we did renew and we renewed under terms of a contract that said the premium for this policy will be determined by our manuals of rules. Okay, that would be the experience rating plan manual, the scopes manual that rates, classifications, and rating plans. That would include the schedule rating plan, which they admitted in the pleadings that rating plans refers to their schedule rating plan. No issue there. Then the policy says the information required below, this is the calculation of the estimated premium that's laid out in detail. The information required below is subject to verification and change by audit. That audit that comes at the end of the policy period, that's not something Liberty chooses to do. They're obligated within six months of policy expiration to audit and then calculate a final premium using actual payroll and corrected factors. All of the factors in the estimated premium could change, even the schedule rating plan, schedule rating factor could change, but again, only under certain limited circumstances. I... ... My client was aware of the schedule rating factors as they were set forth in the estimated premium. No question about that. Did my client appreciate the fact that those changes year to year were illegal and improper based on the contracting documents? No. The record indicates that they retained an outside auditing firm to come in and audit their premiums and audit the premium calculations, and it was the audit firm that said they've been changing your schedule rating factor year to year, and that's prohibited unless they have documentation of changes of the risk characteristics. Liberty refused to provide any. My client then complained to the Department of Insurance. Ultimately, the Department of Insurance looked at this situation and said, you've got fact issues, you need to go see a court of law. That's what they said. That's plainly in the record. With respect to incorporation, we submitted some additional case authority after the completion of briefing, including a case called the Danfoss case in Florida, which is a collection case that Liberty, the same party here, brought against another insured in Florida to collect unpaid workers' compensation premiums. In that case, Liberty Mutual said in their summary judgment motion to the court, NCCI's rates, rating system, classifications, and rules are all incorporated into the policies by operation of law and the policy's language. Example, policy's general section, part five, premium, paragraph A, our manuals, and relevant part, all premium for this policy will be That was a year before, that was after the filing of this court case, a year before they filed their briefs here. Every time a workers' compensation carrier brings a collection action against its insured, it must, by definition, advocate incorporation. Otherwise, there's no way to measure whether the premium has been calculated correctly. A couple more things that were addressed. Damages. The schedule rating factor was not supposed to change, and it did change, and they didn't have the required documentation of any changes in the risk characteristics. Therefore, it was an incorrect factor. The question then becomes, what was the correct experience modification changed from the one that was used in the estimated premium? When calculating the final premium, Liberty would have been obligated to use the new, different factor based on the manual rules. They would have to do that. Same with the schedule rating factor here. We have a factor that was misapplied. My client had three years to contest it. We did so within the three years. And then the question becomes, what was the correct factor? The correct factor was a 4.2 percent credit that would continue each year to year. That was the correct factor that should have been used. Or the carrier could have chose not to renew, or the carrier could have chose not to use the schedule rating factor at all. That's what the contract says. Part 5, premium audit inspection. Yeah, part 5 of the... I'm sorry, there is a... There is a specific Missouri amendment to the audit provision that's here in the standard form policy. And that amended, it's in the full copy of the policies, indicates that the insured has up to three years after policy expiration to challenge the audit that has been performed by the carrier. And I apologize, but I can't put you on the specific record reference of that policy language right now. But there's no dispute as to the fact that the insured has three years to contest an audit. We're asking this court to reverse the district court on its finding that this policy language does not incorporate the manuals of rules, rates, rating plans, and classifications, such that a violation of the provisions of those documents would give rise to a private right of action for breach of contract by the insured. The standard review here is de novo, as if for the first time. We're asking you to evaluate the fact that there is no genuine issue, that Wireco's risk characteristics never changed, and therefore its schedule rating factor was not supposed to change. All right. I think we're covering the same ground again. Right. And so thank you very much, Your Honor. Thank you for all three arguments. The case is submitted. Court is open for discussion. Thank you.